We'll hear counsel in the first case, Stadnick v. Vivint Solar. Go ahead, Mr. Parrott. Thank you, Mr. Court. Nicholas Parrott of the Levy & Kuczynski firm on behalf of the plaintiff appellant Stadnick. Your Honour, this involves a claim under the Securities Act of 1933, specifically Section 11 of that Act, arising from the registration statement, misrepresentations in the registration statement from the initial public offering of the company titled Vivint Solar that occurred on October 1st, 2014. The fact that this is a claim under the Securities Act is a claim that is a fact of high importance here, Your Honour. The Securities Act is not an anti-fraud or Section 11 is not an anti-fraud provision. It is more akin to a consumer protection statute. It provides for strict liability. It is in furtherance of a congressional policy in favour of more disclosure in the context of the initial public offerings for the sale of securities, in this case common stock, to the public. Again, importantly, it is governed by, as it's not a fraud statute and we do not assert fraud claims, it is governed by the plaintiff-friendly standard of Rule 8 of the Federal Rules of Civil Procedure, rather than the more onerous standards in Rule 9b for fraud claims or the even higher standards of the Private Securities Litigation Reform Act of 1995. The District Court, in response to the defendant's motion to dismiss, found that the plaintiff did not meet what is described as the minimal burden to plead a claim under Section 11 of the Securities Act, that is the statement of the Supreme Court and of this Court, and dismissed the claims. We submit that as error in two instances. The first involves... So you're only appealing two determinations, is that understandable? Correct, Your Honor. The two misrepresentations that we allege it was error to dismiss our claims. The first involves the failure to disclose the dramatic change in the financial results of the company that occurred in the third quarter of 2014. Here the chronology is important. The initial public offering closed on October 1st, 2014, the day after the closing of the third quarter of 2014, which was on September 30th, 2014. The registration statement only contained results through to the end of the second quarter, so as of June 30th, 2014. There was no disclosure of the company's results for the third quarter, September 30th, 2014. The results that were disclosed show a fairly consistent performance in connection with two important metrics that we would submit a report... Now the rules do not require the disclosure of the third quarter results under these circumstances. There's one case in First Circuit, Schulte, which says that if the change is extraordinary, then you need to do it. That's the First Circuit case, but the weight of authority, generally speaking, is that you don't. Well, I'm not sure I would agree that the weight of authority is that you do not. There is an SEC rule that says that you must update any financial results that are over 135 days old. The June 30 results were not over 135 days old. We do not allege that that specific rule required updating the financial results in the second quarter. The other SEC rules state clearly that you must disclose material information if it would make the disclosed information not misleading. There's an instruction to Regulation SK, Item 301, which says you should think about updating... So you think the rule is the Shaw rule? We would advocate. I think the Shaw rule is entirely consistent with the prior rule of this court. So what was extraordinary here that would require the updating? By that I mean out of the ordinary, not just the change itself, but what was out of the ordinary. Given the way the accounting treatment that was made between the various entities within the organization when they sold these units. So the question, as the Shaw rule is expressed, as we would propose to the court to adopt the Shaw rule, it's do the interim results fall outside the range of values or range of results you could reasonably expect from the disclosed information? If there were wild variations, depending upon circumstances, that really didn't have anything to do with the profitability of the company, the timing of installations and the receipt of funds from investors could determine whether something was an earning of the company or not. Well, I'd have two responses. First of all, we know that now. I don't think that's apparent from the face of the registration statement. The registration statement, which discloses the accounting methodology... ...showed the shifts and they did describe the accounting treatment. Well, they described the accounting treatment. It showed variability in results, but the results in terms of the income and the earnings per share, income to common stockholders and to the earnings per share, was fairly consistent, showed relatively positive, relatively stable. For instance, for the six months, I think for the period ended December 31, 2013, they showed positive income of 5.6 million. For the period ended June 30, 2014, six months, they showed income of 12.5 million. And again, positive earnings per share. And then we go to, for the three months, we go to a loss of 35.5 million. I mean, it's a 740 percent, I believe, we calculated swing. That wasn't extraordinary, was it? I mean, the amount seems to be, but when you read it in connection with the disclosures of the accounting methods, it seems to be somewhat ordinary. Well, I guess I would respectfully disagree. I don't think a reasonable investor would take from the description of the accounting policy, which doesn't disclose how the impact would be on net income or on earnings per share. All that an investor would know looking at the registration statement is, look at how earnings per share and income has performed over the prior, say, 12 months or 18 months, which was the longest period we had, and all that showed was fairly consistent net income and fairly consistent earnings per share. It did not show anything like the dramatic swing. But the registration statement did disclose the level of volatility, very high level of volatility, as I understand it, as I read it in front of me. And it says we expect to continue to incur net losses from operations as we increase our spending. Well, that's net loss. With respect, I think that's a different metric. So you want us to focus on one metric, which is net losses attributable to stockhold. Is that correct? And earnings per share, Your Honor. And I would submit those are two highly important metrics. So total revenue, roughly in line and consistent over the period from March 31st, 2013, to September 30th, 2014. So operating expenses are trending upward, which might account for losses and then significantly increase as of September 30th. But you don't want us to take a look at that. Net losses generally and then net losses to the NCIs, also consistent losses. You want us to look at two metrics. Well, again, with respect, not just two metrics. These aren't obscure metrics, Your Honor. These are critical metrics. In fact, the SEC requires three metrics from an income statement to be included in the registration statement, and these are two of them, earnings per share and net income. So I would concede that they should be absolutely determined to be material. The third thing is I think it's important to look at the reaction of the stock of the market. I mean, they were dramatic. Once these results were announced, just six weeks after the IPO, the stock price declined 20%. The investors were clearly surprised and responded by selling their stock. And if we disagree with you that we should rely on Shaw and that we should instead look at DeMaria, then what's your response? Well, I think DeMaria is completely consistent with Shaw. I think the rule that this Court applied to DeMaria, which was you need to look at, it's a, you know, there's no guideline rule. It's a judgment call on behalf of the Court. But you need to look at really how big a departure is the interim information from the information presented in the registration statement. In DeMaria, it wasn't much of a difference. I mean, it was a decline from 20% growth to something like 18% growth, I think, if you actually looked at the metrics. That's, we would submit and we would agree that that's not an extreme departure. And is it your position that in order to assess whether there's a, whether a change of the sort that you're relying on here constitutes an actionable extreme departure, that that really can't be done under any circumstances at the motion to dismiss stage, or can it be done? I think it certainly can be done. I wish I could propose a guideline rule for courts to adopt. Well, that's what I'm looking for. Unfortunately, I think we're in an area of judgment. I would submit that a 740% swing from profit to loss represents, would it be over any line you might want to draw and represents an extreme departure. Of course, I gather you would not be here if the earnings per share, for whatever reason, because of the other metrics not related to net income attributable to stockholders, or net loss attributable to stockholders, if the earnings per share had remained the same, if it remained roughly the same. If it remained roughly the same, exactly, Your Honor. I mean, what counts is the rate, the amount. So really what we're looking at is the extreme departure on the earnings per share. Well, I think on the earnings per share, I mean, they're essentially the same metric, because one is just one divided by the number of shares outstanding. So the amounts are essentially the same thing. So it's the declines of negative $35 million in loss and the negative $0.45 per share on earnings per share. We believe that's an extreme departure. We think that presented a radically different picture of the company than what was presented by the registration statement. The stock price movement, which defendants would have the court ignore, I think, is an important factor for the court to consider and demonstrate that. And the stock price has never recovered as a result. Thank you, Mr. Parra. You're reserved three minutes. Thank you, Your Honor. I have gotten four extra, but that's okay, too. Okay, Mr. Kassner, go ahead. Good morning, Your Honors. May it please the Court, I'm Jay Kassner, appearing for the Vivint Solar-related appellees. Judge Forrest, in a word, got it right. Regardless of whether you look for purposes of the quarterly earnings, interim earnings analysis, at the First Circuit decision in Shaw, and, Judge Walker, to point the Court to an answer to a question that you gave, the First Circuit in Shaw uses this extreme departure language. But on the bottom of page 1207 of the reported opinion, they give a little bit of meat on what that means. And the First Circuit says, did the interim results, quote, forebode disaster? That is a consistent standard, Judge Walker and Judge Lohier, both of you asked the questions to the DeMaria decision, which, actually, Judge Walker, I had the pleasure of arguing in front of Your Honor, I think, 15 years ago at this point. In that standard, as articulated in that case, as here, and as Judge Forrest correctly found below, the offering documents are, quote, replete with warnings and explanations, and, quote, do not paint an unrealistically optimistic picture of future performance. That's at pages 181 and 182. Judge Lohier, if the Court were to conclude that the Shaw standard is not the law of this circuit, we would also commend the Court to the Second Circuit's panel affirmance of Judge Baer in the N2K decision, where the Court said, were the results that the plaintiff in this case is seeking to have disclosed, quote, within the range of plausible results? As in DeMaria and as in N2K, and as the Court has acknowledged in questioning counsel for the plaintiff, there were extensive risk disclosures with respect to financial performance given the nature of the business here, a speculative solar energy installation company with very, very large upfront costs and a revenue stream that is paid out over time. In the registration statement at pages A161 to 162 of the record, quote, we have incurred operating losses and may be unable to achieve or sustain profitability in the future. Page A167, counsel for the plaintiff stood up and indicated to the Court that earnings here did not fluctuate and that there was no disclosure of fluctuation. Perhaps I would commend the Court to page A167 of the record, where Vivint Solar specifically discloses, quote, our operating results may fluctuate from quarter to quarter, which could make our future performance difficult to predict and could cause our operating results for a particular period to fall below expectation, resulting in a severe decline in the price of our common stock. Now, Judge Forrest concluded that interim quarterly results were not required here for three reasons. Number one, taking a holistic look at what was disclosed rather than cherry-picking two line items out of the balance sheet and income statement. And, of course, the holistic approach in viewing a prospectus is what the Supreme Court has again confirmed is the way to view things under the Omnicare case as applied by this Court most recently in an opinion in which you joined Judge Lohier in the Sanofi case. Vivint Solar disclosed what it was required to disclose by SEC regulations. Is there not a limit? That is, isn't, in one sense, the First Circuit correct that there may be a circumstance where the registration statement is filed and the company knows the next day it's going to go into bankruptcy? So that's not this case, but is there not a limit? Indeed, Judge Lohier, there is. And what's that limit? There is, and I think it's obviously to some extent fact-dependent. So in the Shaw case, to use your example, what animated the First Circuit's concern and why there was a disastrous quarter coming had more to do with the fact that as a result of the results that were being reported, the company was going to have to dramatically alter its restructuring plans, that it had disclosed were basically fully baked at that point. So, yes, if the results were to disclose that there was an imminent bankruptcy, for example, I think we would be dealing with a far different case because in the words of the First Circuit or in the words of Judge Walker and DeMaria or Judge Baer and N2K, the prospectus would be conveying a dramatically misleading impression potentially without that. That, of course, is not the case here. And, indeed, to commend the court at page 1210 of the First Circuit's opinion in Shaw, the panel there writes the following, which I think also animates the outcome here and why Judge Forrest got it right. Quote, we reject any bright-line rule that an issuer engaging in a public offering is obligated to disclose that the quarter's results may disappoint the market. And so the test is really far more stringent than what counsel, for my friends on the other side, is advocating. In the interest of time, let me just point to three factors that Judge Forrest relied upon, we think appropriately, to conclude that there was no dramatic disaster cliff waiting at the end of the quarter. Number one, she took a holistic view at the company, what the company considered its, quote, key operating metrics. And that is in the record at page A513. But in contrast to what counsel for the plaintiff urged on the court, net earnings and net income, given this business. Net income to shareholders. Net income to shareholders, yes, Your Honor. And earnings per share is not viewed as a key metric, principally because, as Judge Walker observed, the manner in which you account and get to net earnings because of the unique nature of this business with the partnerships and how you have to allocate losses at the end of every quarter. That renders those metrics quarter to quarter perhaps less germane than it would be if this were a more traditional brick-and-mortar or widget-type corporation. What the company considered. Why would we want to go through or ask a district court to go through this process at the motion-to-dismiss stage? Because it devolves on the district court, Your Honor, to determine whether or not from the facts alleged and from the information of which the court can take judicial notice, which it's undisputed, really, between the parties that that includes information incorporated by references. Exactly, Your Honor. And that's where all of this financial information comes from. Judge Forrest had to make some determination as to whether, based on the facts alleged, was there this extreme departure? In the words of this court, what did the prospectus paint an unrealistically optimistic picture? Or were the third-quarter results, to use Judge Baer's term in N2K, quote, within the range of plausible results? That is why the district court needs to undertake this analysis. And, again, it's in our papers. I'm concerned about my time. But I would urge the court to focus on not necessarily earnings per share and net income available to shareholders, which is only derived after you engage in this somewhat hypothetical, arbitrary book value calculation, but the metrics that the company tells the shareholders and the analysts. What are our key metrics? Each of those four key metrics increased dramatically throughout the entirety of the period in the prospectus, in the third quarter of 2013, in the second quarter of 2014, and in the third quarter of 2014. I'd like to just pause for one moment, counsel, in their papers, and today, again, urge this court to focus on the reaction of the stock market to the announcement of the third quarter. I would urge the court, as I know it will, to be guided by Judge Jacob's opinion in the Hutchinson v. Deutsche Bank case. In that case, Judge Jacob's writing for the panel affirmed a dismissal of a complaint by Judge Underhill, similar circumstance, allegation that the stock price reacted negatively per se. That means they ring the bell and they can go into discovery. Judge Jacob's relying on an opinion of this court in the J.P. Morgan case at 553 F. 3rd, 205, says consideration of potential market reaction to disclosure of a misstatement is too blunt an instrument to be depended on in considering whether a fact is material. Similarly, in the N2K case, the stock there dropped 25%, more than the stock dropped here, and again, that was something that the court did not take cognizance of in determining whether or not it stated a claim. Your Honor, given the time, we will rest on our papers on the second set of misstatements relating to the market in Hawaii, we believe, obviously. Judge Forrest, again, adopting a holistic view and looking at what the disclosures were. May I just finish my sentence? The Gannon 303 issue? Pardon me? The Gannon 303 issue. Yes. Yes, Your Honor. Thank you very much. While you're up. Oh, yes, sir. You drew our attention to the material at A513, headed Key Operating Measures. Would you, as it were, walk us through that? What is it about the material at 513 which you think we should bear particularly in mind? Okay. Yes, Your Honor. If you focus on the four items that are referenced there as key metrics, number one, there's a reference to solar energy system installations, which I think, this is very complicated stuff for me, but I think we can all agree at what solar energy systems installations mean. Those are the number of systems that were installed in a particular period. And as the Court will note, the third quarter of 2013, which is the disastrous information that my friend here urges that the company should have disclosed, 2,921 solar energy systems were installed. By the second quarter of 2014, that number had risen to 5,400. By the third quarter of 2014, that number had risen to close to 7,000. Similarly, megawatts installed, and for the Court, to the extent that it wishes a more fulsome explanation than Kasner, a non-solar energy lawyer, can give the Court, I would commend the Court to pages A149 of the record, which does have a definition of each one of the terms that appear here. So the number of installations actually increases. Correct, Your Honor. The number of megawatts installed doesn't. If we can consider all this, as you say, tends to rebut the allegation, or the inference that they want us to draw of decreasing installations. Correct, Your Honor. And I think, as I say, again, may I just finish my sentence? Please, absolutely. Again, mindful of the mandate of the Supreme Court in Omnicare and this Court's view in the Sanofi case, it was incumbent upon Judge Forrest to correctly employ a holistic view of the record, rather than focusing on just one metric. But, yes, Your Honor, it is entirely appropriate for the Court to view these. Otherwise, there is no way that the District Court can make a judgment. So what accounts for the declining market share? The declining market share? In Hawaii. Well, interestingly, Your Honor, the market share in Hawaii declined based on the fact, as disclosed in the prospectus, that the market in Hawaii was constrained, or had been constrained. However, what Judge Forrest focused on, and what there is nothing in the record or out alleged to address, is that the installations in Hawaii, quarter to quarter, grew. The market share shrunk when you look at the relative Hawaii versus their entire book of business. Right. It wasn't market share of the product vis-à-vis other competitors. Correct. It was just fewer in Hawaii. Presumably, that 2% difference was made up elsewhere. In fact, Your Honor, the plaintiff wishes the Court to take a look at the first quarter 10Q for 2015, which was not in the record, is not in their complaint. It was added, and we submit is not appropriate on a motion to dismiss. But what it says in there, this is, of course, months after the end of the offering, but to Judge Walker's question, quote, while our growth in other markets has more than offset the impact of these limitations in Hawaii, and then it goes on. So that explains the decline. Thanks very much. Thank you, Your Honors. Mr. Parr has reserved three minutes. Thank you very much, Your Honors. I would like to emphasize, this came up in the argument with my friend just recently, is that we are at the pleading stage at this point in time. We have engaged in, and defendants are asking, both us, Judge Forrest, and us, this Court, to essentially engage in, to weigh competing inferences that may be drawn from the disclosures in the registration statement. And I don't think that's proper or appropriate at this particular point in the proceeding. We are, plaintiff is entitled to... How is it avoidable? In these particular, this particular species of cases? I mean, what is, you're suggesting some sort of bright line rule or something close to it. Well, I think, as I was about to continue, in particular, in the context of materiality, this Court has observed over and over again that that is, which essentially is what we're coming down to. The defendants essentially ask Judge Forrest and are asking this Court to determine that in the context of this registration statement, the net income attributable to stockholders and earnings per share is immaterial as a matter of law. And this Court has held that that's a very difficult determination to make at a motion to dismiss phase. You essentially need to say that no reasonable mind could disagree about whether it's material or not. I think it would be extraordinary... Well, no, it's not just materiality, it's disclosure. So they also say that they, under the speech caution doctrine or some other doctrine, that they, the company, disclosed the real possibility that not only in connection with volatility, but the real possibility of a significant loss. Well, I think talking about the risk factors I think is here. These are actual results. We're alleging the omission of historical information, the results from the third quarter, the interim financial results. Risk factors of the speech caution do not apply to the disclosure, non-disclosure of historical results. They talk about forward-looking material, information. We are not alleging that there was a failure to disclose forward-looking material. This is actual results. So they have these results, they just didn't disclose it, they should have disclosed it within the registration statement. Correct, Your Honor. They should have disclosed that their third quarter was going to have dramatic change from positive net income attributable to stockholders and earnings per share to dramatically negative. That's what should have been disclosed, that information was available. They don't dispute that information was known to them. So that fundamentally is our case. I don't think, say, the risk factors of the speech caution is really relevant. And, again, I think we are now getting in a stage where we are weighing competing inferences and trying to interpret the registration statement where at this point the question is, are our claims plausible and can we get discovery to prove them? I don't think we have met that standard, unless you have any further questions. Is there anything wrong with Mr. Krasner's argument that we should consider what was important to the company as was stated in the various extent used in the registration statement? Well, that's not, the test of materiality is what a reasonable investor regarded as altering the total mix of information and would it be relevant to their decision. So obviously what the company thinks is important is relevant. I think you need to look at what a reasonable investor would think about. It's a somewhat objective test. And, once again, I would disagree with Mr. Krasner that the market reaction is a fact. We don't argue that it's a per se test, that we automatically get to materiality if there is a material drop. But when you combine it with the dramatic change in the metrics, and you look at the actual metrics that are involved here, earnings per share, a critical investing metric, couple that with the stock market reaction, I think those support here strongly an inference of, a plausible inference, that the omitted information was material. Thanks, Frank. We'll reserve the decision.